IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2016

## RONNIE LAMONT HARSHAW v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 103023     Bob R. McGee, Judge**

_____

**No. E2015-00900-CCA-R3-PC – Filed March 24, 2017**

_____

The Petitioner, Ronnie Lamont Harshaw, pled guilty to two counts of attempted first degree murder, Class A felonies; three counts of aggravated assault, Class B felonies;[1] reckless endangerment by firing into an occupied habitation, a Class C felony; two counts of being a convicted felon in possession of a firearm, Class D felonies; and two counts of employing a firearm during the commission of a dangerous felony, Class C felonies. He received an effective sentence of thirty-six years. The Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective and that his guilty pleas were not knowingly and voluntarily entered. The post-conviction court denied the petition, and the Petitioner appeals. On appeal, the Petitioner also argues that the criminal gang enhancement statute, which was applied to increase his aggravated assault convictions from Class C felonies to Class B felonies, is unconstitutional. Upon review, we conclude that pursuant to State v. Bonds, 502 S.W.3d 118 (Tenn. Crim. App. 2016), the criminal gang enhancement statute is unconstitutional; therefore, we must reverse the judgments for the aggravated assault convictions in counts three, four, and five in case number 100379; vacate the criminal gang enhancements in those convictions; and remand for entry of judgments reflecting that each aggravated assault conviction is a Class C felony with a sentence of fifteen years. The Petitioner's total effective sentence remains the same. The judgments of conviction are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part; Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

---

[1] During the plea hearing, the State acknowledged that aggravated assault was a Class C felony but that it was increased to a Class B felony "because of the gang enhancement."

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Ronnie Lamont Harshaw.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In a multi-count indictment, the Petitioner was charged with eleven offenses,[2] and he faced a potential total sentence of 140 years. At the guilty plea hearing, the State recited the following factual basis for the Petitioner's pleas:

> [O]n September 18th, 2012, [the Petitioner] was married to a Trisha Harshaw. . . . [T]hey were separated and . . . there was an Order of Protection in place preventing [the Petitioner] from assaulting or threatening any type of violence towards Trisha Harshaw.
>
> The proof would be that Ms. Harshaw lived at an apartment complex. She was there at the apartment with a number of people in the apartment, to include her foster daughter, the foster daughter's – that being Kayla Thompson and her husband, as well as the kids, who would be under the age of 18. The proof would be that [the Petitioner] started calling – or calling Ms. Trisha Harshaw's cell phone.
>
> At one point in time Kayla Thompson picked up the phone recognizing the number [as the Petitioner's] number and just heard rain on the other end. And it was raining that night.
>
> Further proof would be that next [the Petitioner] began sending text messages to Trish Harshaw, threatening messages telling her that he was on his way over. She needs to hit the button, answer the phone.

---

[2] One charge ultimately was "dismissed as charged in the alternative."

Eventually he gets over to the apartment along with two other individuals and he begins banging on the door. At one point in time one of the members inside the house, they look outside. They see his face. Additionally, they're able to identify his voice. A short time after this is when bullets begin to pierce the window coming inside the apartment.

Further proof would be that Ms. Thompson was injured by some debris, probably some glass from the shattered window.

Further proof would be that they did report this to the police. The police began investigating this case, were able to locate a house or an apartment that [the Petitioner] stayed at over in Walter P. Taylor Homes with a Ms. Lisa Harris, and went to that apartment complex. In the bedroom they found a number of unspent rounds of ammunition, and these rounds of ammunition would be the same type of – same caliber, same type of the empty shell casings that were left there outside of the apartment complex, along with one unfired spent – one unfired round that was outside of the apartment complex.

Additionally, while talking to Ms. Lisa Harris, the officers talked to her about the type of – whether or not [the Petitioner] had a gun and she was able to identify a very distinctive gun which he had. And this very distinctive gun is the same type of gun that fired this type of ammunition. It's a Carbine rifle, and that's just not very prevalent.

Further proof would be that – and this was the type of rifle that was used to shoot into the apartment complex.

Further proof would be that [the Petitioner] does have at least two prior convictions involving force and violence, that being the robbery conviction and the aggravated assault conviction . . . . Additionally, [the Petitioner] has a number of other convictions.

The trial court specifically asked if the Petitioner was "stipulating [to] the gang enhancement provisions." Trial counsel acknowledged that the enhancement was part of the plea agreement. The State recited the factual basis for the gang enhancement:

- 3 -

[I]f called upon in a sentencing hearing our proof would be that [the Petitioner] is a member of – or at the time was a member of the Vice Lords. He is documented by the Knox County Sheriff's Department as being a member of Vice Lords. People – his associates, his friends, Trish Harshaw, would identify him as being a member of the Vice Lords at that time.

The State recited further proof supporting the application of the gang enhancement.

The plea agreement provided that the Petitioner would receive a total effective sentence of thirty-six years. Further, pursuant to the plea agreement, the State agreed not to refer the cases to the federal authorities.

Following the State's pronouncement, the trial court asked the Petitioner if he was under the influence of any substance(s) that might affect his understanding of the plea agreement, and the Petitioner said that he was not. The Petitioner agreed that the State had recounted the plea agreement as he understood it. The trial court asked if the Petitioner was aware he was pleading outside his range, if he had discussed it with his attorney, and if it was the Petitioner's desire to do so. The Petitioner responded affirmatively, stating that he understood the plea agreement and that he had discussed it with his attorney. The Petitioner acknowledged that he was aware of the rights he was waiving by entering guilty pleas. He said that he was entering the guilty pleas "freely, and voluntarily, and knowingly" and that he had not been threatened or coerced into entering the pleas. The Petitioner further said that he was satisfied with counsel's performance. Following the colloquy with the Petitioner, the trial court accepted the plea agreement.

At the post-conviction hearing, the Petitioner testified that he felt compelled to plead guilty because his trial counsel was not adequately prepared for trial, which was scheduled to be held approximately one week after the guilty plea hearing. The Petitioner said he met with trial counsel four or five times prior to the guilty plea hearing, but they had "no communication." Trial counsel told the Petitioner about the State's plea offer but did not discuss potential trial "tactics" with him. The Petitioner said that approximately two months prior to trial, he and counsel met at the detention facility, and counsel showed him the presentments and a motion for discovery. The Petitioner acknowledged trial counsel showed him audio and video recordings that counsel had obtained from the State. The recordings included the statements of the Petitioner's ex-wife, Trisha Harshaw; Kayla Thompson; Braden Thomas; and Jennifer Raff. The Petitioner said that he and counsel did not discuss the contents of the statements and that trial counsel did not bring him any "paper documents."

- 4 -

The Petitioner complained that trial counsel failed to interview Sherry Robinson, Danielle Davis, and Reba Turner. The Petitioner said that the witnesses would have testified that Harshaw and Thompson came to Walter P. Taylor Homes where he was staying, and Harshaw began "hitting on" him. The Petitioner said that Harshaw asked him to come to her car to sign divorce papers but that when he arrived at the car, he learned she did not have the divorce papers with her. The Petitioner opined that the testimony would have been beneficial to his defense.

The Petitioner said that he gave trial counsel the names and telephone numbers of the three potential witnesses. Approximately three weeks before trial, trial counsel brought a private investigator to a meeting with the Petitioner. The investigator said that he was working on a murder case and asked to speak with the Petitioner later without counsel. The Petitioner agreed, but the investigator never returned. The Petitioner said that Robinson and Turner told him they were not contacted by trial counsel or the investigator. The Petitioner did not know whether trial counsel or the investigator ever spoke with Davis.

The Petitioner said he told trial counsel that he had spoken with Harshaw and that she was willing to testify that the Petitioner was not the person who shot into her house. When post-conviction counsel asked if the Petitioner discussed with trial counsel ways to impeach the State's witnesses, the Petitioner responded that he told trial counsel Thompson had a "drug habit" and requested that trial counsel obtain her medical records. He did not, however, think trial counsel complied. The Petitioner further asserted that he thought the victim's medical records "would also not show any gunshot wounds as described."

The Petitioner averred that trial counsel did not perform any pretrial investigation, noting that he never saw any documentation of the actions counsel was taking regarding the case. The Petitioner acknowledged that trial counsel said the private investigator had spoken with Harshaw, but the Petitioner complained that counsel did not reveal what was learned during that conversation. The Petitioner did not know whether trial counsel or the investigator visited the crime scene but said that he and trial counsel never discussed any evidence regarding the crime scene other than trial counsel showing the Petitioner "pictures off the disk."

The Petitioner asserted that he and trial counsel never discussed any potential defenses concerning the Petitioner's state of mind or intent at the time of the crimes. The Petitioner said that he had sickle cell anemia, depression, anxiety, and attention deficit hyperactivity disorder (ADHD). He began taking medication for the conditions when he was incarcerated, and approximately one week prior to entering the guilty pleas, the medication was increased. Around that time, trial counsel brought the plea agreement to

the Petitioner while he was in a holding cell and told him to sign it. The Petitioner said that he could not read well and that he did not understand some of the words in the plea agreement. Trial counsel did not read the plea agreement to him or explain it. Despite not reading or understanding the agreement, the Petitioner signed it.

The Petitioner said that he requested a mental evaluation but that an evaluation was never performed. The Petitioner opined that if the evaluation had been performed, trial counsel would have known about the Petitioner's "learning disability" and given the Petitioner "more help understanding the law and the trial preparation." The Petitioner also wrote letters complaining about trial counsel to the Board of Professional Responsibility.

The Petitioner said he was with two other men during the shooting, but he did not have the gun when he was apprehended. Therefore, the Petitioner asked trial counsel to file a motion to suppress evidence, namely the gun that was used in the crime. Trial counsel did not file a motion to suppress.

The Petitioner said his case was set for trial in February 2013, but it was rescheduled until June 2013. The Petitioner maintained that trial counsel had visited him only once before the February court date. Thereafter, trial counsel visited him four or five times, and each meeting lasted fifteen to thirty minutes.

The Petitioner said that the case against him was based on hearsay and that the State had "no substantial evidence" against him. The Petitioner said trial counsel told him that if he did not accept the plea, he would "never see daylight." The Petitioner was concerned about counsel's failure to adequately investigate the case, and he decided to accept the plea so he would have a chance of being released.

The Petitioner said trial counsel initially told him that the State had "overcharged" him and that the Petitioner committed only reckless endangerment. A couple of weeks later, trial counsel brought the Petitioner the State's offer of a thirty-year sentence. The Petitioner did not see trial counsel again until the guilty plea hearing. Trial counsel never advised the Petitioner of the maximum sentence he could receive if convicted at trial. The Petitioner said that trial counsel never told him that he was receiving a "hybrid" sentence and asserted that he did not know what a "hybrid" sentence was.[3] The Petitioner was not aware of any other plea offers.

---

[3] At the guilty plea hearing, the State announced that the Petitioner was receiving a "hybrid sentence." At the post-conviction hearing, trial counsel testified that he did not know to what the State was referring when it called the sentence a "hybrid." Nevertheless, our review of the record reveals that for each Class A felony conviction of attempted first degree murder, the Petitioner received a Range II sentence of thirty years and the release eligibility of a career offender, which made the Petitioner eligible for release after serving sixty percent of the sentence in confinement.

On cross-examination, the Petitioner acknowledged that he had pled guilty to several crimes in Blount and Knox Counties and that he had been represented by counsel in each of those cases. The Petitioner said that he knew his constitutional rights from those cases and by being advised by a police officer after being arrested for the shooting into Harshaw's house.

The Petitioner said that he gave a statement to the police, acknowledging that he drove a man to Harshaw's house but asserting that the man was not armed. He admitted that he was at Harshaw's house at the time the shooting occurred. He said he "probably" told the police that the shooter was "a fellow gang member."

The Petitioner agreed that he was arrested and charged by presentment and that trial counsel was appointed to represent him. He agreed that trial counsel provided him with copies of the discovery materials. He acknowledged that Harshaw and Thompson saw his face and heard his voice at the scene but claimed that they did not know his exact location at the time of the shooting.

The Petitioner conceded that he signed the plea agreement. He acknowledged that the plea agreement advised him of the charges against him, the maximum and minimum sentences he could receive on each charge, and the rights he was waiving by entering guilty pleas, but he asserted that "none of that was never read to me." The Petitioner conceded that he agreed to the "gang enhance[ment]" but maintained that trial counsel did not explain the gang enhancement. He recalled hearing the State recount the plea agreement at the guilty plea hearing and being questioned by the trial court about his understanding of the agreement. He conceded that he told the trial court he understood the plea agreement but maintained that he "was on medication at the time." He acknowledged he told the trial court that he was not taking any substance that would affect his understanding of the proceedings. He also told the trial court that he understood the plea agreement and that he was entering the guilty pleas knowingly and voluntarily.

On redirect examination, the Petitioner asserted that trial counsel showed him only one page of the plea agreement when asking the Petitioner to sign it. The Petitioner said that he did not see the other pages, which contained the information about the charges and sentences he faced, until "a month after [trial counsel] started coming to see [the Petitioner] . . . when he was telling [the Petitioner] that [he] should have been charged with reckless endangerment." Nevertheless, he asserted that trial counsel never told him "what the maximum and minimum sentences under the proposed plea agreement would be" but told him that he would likely spend the rest of his life in jail.

The Petitioner said that he affirmatively answered the questions the trial court asked during the guilty plea hearing because he felt that trial counsel "gave up" on him and did not act in his best interests. The Petitioner said that he filed a motion to "recuse" counsel, but the motion was denied.

Trial counsel testified that he had practiced law, primarily criminal defense, since 2001. Trial counsel was appointed to represent the Petitioner. In order to familiarize himself with the case, he spoke with the Petitioner and the prosecutor and reviewed the discovery materials.

Trial counsel said that he knew the prosecutor typically did not "back off much in terms of plea offers," that she had a reputation for being willing to try any case, and that she made plea offers that were not necessarily advantageous to defendants. When trial counsel spoke with the prosecutor, she indicated that she intended to take the case to trial. Therefore, trial counsel did not expect to get a "reasonable offer" from the State. Trial counsel believed he had to be prepared for trial because of the seriousness of the charges against the Petitioner, the Petitioner's extensive criminal history, and the potential life sentence.

Trial counsel recalled that soon after he was appointed, he met with the Petitioner then filed a motion for discovery. The discovery materials were mostly on compact discs but also included paper documents such as police reports. Between October 2012 and February 2013, he visited with the Petitioner at the detention facility approximately six times. Trial counsel took his laptop computer to the meetings to show the Petitioner what was on the discs and reviewed the discovery materials with him.

Trial counsel said that "over the holiday break," the Petitioner began writing complaint letters about counsel, and their relationship began to deteriorate. He noted that during one meeting, the Petitioner "just got up and left [counsel] in the interview room." Trial counsel made a motion for a continuance, and, during a hearing on the motion, he told the trial court about the problems he was having with the Petitioner. The trial court would not allow counsel to withdraw and reset the trial for the end of June.

Trial counsel conceded that he was not "well prepared" to go to trial in February because he and the Petitioner "had no communication at that point." Trial counsel said that he had not provided the Petitioner with copies of the paper discovery materials by the time of the February hearing because their relationship "had deteriorated to such a point." However, he provided them later. He also "printed [the Petitioner] off the law, what he was charged with[,] all the sentencing issues, and so on and so forth. So he had quite a number of documents."

Trial counsel said the Petitioner gave a statement that "put himself there [at the scene of the crime]. He made statements, you know, drug deal gone bad or whatever his rationale was at that time." Trial counsel said that the Petitioner's statement "closed off a number of avenues we could pursue to defend him." Trial counsel said that the defense's greatest problem was the statement the Petitioner made to police. Accordingly, trial counsel determined that the best defense was to attempt to mitigate the charges by getting "the mens rea and actus rea down to a point where we could get a good result in front of this jury."

Trial counsel acknowledged that he knew the Petitioner was taking medication but did not recall the Petitioner having "a medication issue that would impact his ability to understand what was going on." Trial counsel said that during his representation, he was in contact with the Petitioner's girlfriend and sister and that no one ever suggested the Petitioner had mental health issues. Trial counsel asserted that if he had been made aware of any mental health issues, he would have pursued the issue "[n]ot just for the sake of competency or insanity for the case, but [because he did not] want [his] clients suffering while they're incarcerated."

Trial counsel said that as part of discovery, the State provided medical documents related to the injuries suffered by the victims. The documents reflected that a bullet ricocheted off of a window and hit Thompson's hand.

Trial counsel said that he investigated the case by reviewing the discovery materials, consulting the Petitioner, consulting the State, and hiring a private investigator to interview the witnesses. Trial counsel said that the investigator was hired approximately sixty days prior to the June trial date. The investigator went to the crime scene, and trial counsel reviewed photographs of the scene. Trial counsel said that he had intended to visit the crime scene before trial.

Trial counsel did not recall the Petitioner's providing a list of potential witnesses but acknowledged that the Petitioner may have provided such a list. Trial counsel said that he would have given the investigator any names and contact information the Petitioner provided and that the investigator would have kept trial counsel apprised of any developments in the investigation. Trial counsel said that he did not interview the witnesses because he did not "want to be in a situation where [he] became a witness in the case." He said that he tried to keep himself "away from any appearance of conflicts or impropriety with any witnesses on the case, if at all possible."

Trial counsel said the investigator interviewed the victims, but trial counsel could not recall the names of any other people the investigator interviewed. Harshaw told the investigator that she did not want to testify but that "the State was making her." Harshaw acknowledged that she would testify about what happened but that she did not want

anything bad to happen to the Petitioner. Trial counsel said, "I guess some time had passed and she – she had moved on beyond that. But she was not coming to court to testify in his favor. She just wasn't." Counsel further noted that Harshaw had given a statement to the police about what occurred that night.

Trial counsel said he explained to the Petitioner that because he "was presented to the Grand Jury, . . . he didn't have a right to a preliminary hearing." Trial counsel advised the Petitioner of all the evidence against him and discussed whether certain evidence could be suppressed. Trial counsel said that he did not file a motion to dismiss charges prior to trial, explaining that he was "not going to file a frivolous motion."

Trial counsel said that he had a good working relationship with the investigator and had worked with the investigator on previous occasions.

Trial counsel said that on the day of the guilty plea hearing, he wrote the agreement by hand. He then met with the Petitioner, and the Petitioner signed the agreement. Trial counsel maintained that he showed the Petitioner the entire plea agreement "packet," noting that all of the pages were stapled together. Trial counsel said that he met with the Petitioner two or three times the week prior to the guilty plea hearing and that during those meetings, he thoroughly went over "[n]ot only what the plea agreement was going to be, but actually the process, so that [the Petitioner] would feel comfortable coming into court and being able to go through the process of the plea." Trial counsel maintained that their conversation immediately before the guilty plea hearing "was just a rehash of what we had already talked about." Trial counsel acknowledged that he never used the word "hybrid" when discussing sentencing with the Petitioner.

On cross-examination, trial counsel said that during plea negotiations, he generally tried to obtain the best agreement possible for his clients and to present the clients with as many options as possible. He said that the choice of whether to plead guilty or proceed to trial was always made by the clients.

Trial counsel said that immediately prior to the shooting, the Petitioner sent text messages to Harshaw saying that he was coming to her residence and that Harshaw or Thompson looked out the peep hole and recognized the Petitioner. They also recognized the Petitioner's voice when he yelled and "pound[ed]" on the door. Additionally, the Petitioner gave the police a statement putting himself at the scene at the time of the shooting, which corroborated the victims' statements. Trial counsel opined that the foregoing evidence could be used to establish premeditation.

Trial counsel said that he effectively represented the Petitioner:

- 10 -

I explained to him the law, explained to him what his exposure was, provided him the documentation as such, went over that thoroughly with him. Went through the evidence with him. Went through the potential – what I call preparing the case, which is taking the law and the evidence through trial practice, explaining what I think the State's going to try to do, what we could try to do, and try to explain, hey, this is what your best case scenario is, this is what your worst case scenario is.

And then on top of that, if I have a plea agreement to bring my client, I explain to them, hey, this and as opposed to the preparation of the case, he can make a decision, or she can make a decision based on that analysis.

Trial counsel said that the Petitioner was a career offender, which could have resulted in a sentence of sixty years for the Class A conviction of attempted first degree murder.[4] However, trial counsel negotiated a sentence of thirty years, which was a Range II sentence.[5] Trial counsel said that the sentencing terms were set out in the plea agreement and that he discussed sentencing with the Petitioner. Trial counsel said that the sentence the Petitioner received "was to his benefit," noting that the Petitioner likely would have received a substantially longer sentence if convicted at trial. Trial counsel stated that if the Petitioner had been convicted of all of the charged offenses, he faced a maximum sentence of 140 years. Trial counsel said that if the Petitioner had been acquitted of every offense except reckless endangerment, he still faced a sentence of thirty years with release eligibility after serving sixty percent of the sentence. Trial counsel said that although the effective sentence the Petitioner received was lengthy, he could be released eventually instead of spending the rest of his life in prison.

Trial counsel said that he wanted the Petitioner to feel comfortable with pleading guilty because it was a "big decision." Trial counsel said that if the Petitioner had chosen not to plead guilty, counsel would have proceeded to trial. Nevertheless, trial counsel said that he thought going to trial was not worth the risk of being convicted and receiving an effective sentence of life imprisonment.

At the conclusion of the hearing, the post-conviction court found that the Petitioner had failed to prove trial counsel was deficient by not interviewing the witnesses suggested by the Petitioner, noting that the Petitioner did not have the

---

[4] See Tenn. Code Ann. §§ 40-35-108(c), -112(c)(1), and -110, Sentc'g Comm'n Cmts.

[5] See Tenn. Code Ann. § 40-35-112(b)(1).

witnesses testify at the post-conviction hearing. The post-conviction court found that trial counsel discussed the discovery materials with the Petitioner. The post-conviction court noted that the Petitioner potentially could have received a much greater sentence if convicted at trial and that the plea agreement was in his favor. The post-conviction court found that trial counsel was conscientious, investigated the case, communicated with the Petitioner, advised him about sentencing, reviewed the State's proof, and explained "what his chances" were. Therefore, the post-conviction court found that trial counsel was not ineffective. Further, the post-conviction court found that the Petitioner testified at the guilty plea hearing that he understood the plea agreement, that he was not under the influence of any medication that might affect his understanding of the proceedings, and that he knowingly and voluntarily wanted to plead guilty. Accordingly, the post-conviction court denied relief.

On appeal, the Petitioner challenges the rulings of the post-conviction court. He also maintains that he

> suffer[ed] constitutional error by entering into a plea agreement at the advice of his original trial attorney, where the plea agreement involved . . . acceptance of an unconstitutional sentencing enhancement for gang membership that violated his rights to substantive due process and was unrelated to any criminal activity charged in his presentment.

## II. Analysis

### A. Post-Conviction

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

### 1. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

The Petitioner contends that his trial counsel was ineffective by failing to investigate the case adequately, by failing to provide the Petitioner with information relating to the case and review the information with him, and by failing to apprise the Petitioner of the consequences of the guilty pleas. The State responds that the post-conviction court correctly found that the Petitioner's counsel was not ineffective. We agree with the State.

The post-conviction court accredited trial counsel's testimony that he investigated the case, examined the State's discovery materials, and discussed the evidence with the Petitioner. Further, the post-conviction court noted that although the Petitioner

- 13 -

complained that trial counsel failed to fully investigate the case by neglecting to interview the three witnesses the Petitioner suggested, the witnesses did not testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit the witnesses might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

The post-conviction court also accredited trial counsel's testimony that he advised the Petitioner about the charges against him, the potential sentences he could receive if convicted at trial, the likelihood of conviction, and the terms of the plea agreement. The record does not preponderate against the findings of the post-conviction court. Therefore, we can discern no error in the post-conviction court's finding that the Petitioner's counsel was not ineffective.

## 2. Knowing and Voluntary Pleas

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

The Petitioner contends that he was insufficiently advised by trial counsel and that trial counsel was not prepared to go to trial. The Petitioner asserts, therefore, that he felt compelled to accept the plea agreement. The State contends that the Petitioner's guilty pleas were knowingly and voluntarily made. We agree with the State.

As the post-conviction court observed, the Petitioner stated at the guilty plea hearing that he was satisfied with counsel, that he understood the plea agreement, that he was not being coerced into pleading guilty, and that his guilty pleas were knowing and voluntary. This court has stated that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Further, trial counsel testified at the post-conviction hearing that he thoroughly investigated the case, advised the Petitioner of his chances of being convicted at trial, explained the consequences of a trial versus guilty pleas, and reviewed the terms of the plea agreement, which were favorable to the Petitioner. The Petitioner agreed that he entered the guilty pleas to avoid the much longer sentence he could have received if convicted at trial. Moreover, we note that the Petitioner, as a career offender, was no stranger to criminal proceedings, including guilty pleas. As the post-conviction court stated, although the Petitioner has "been sitting in prison for a while, doesn't like the idea of having to serve so many years[,] . . . that doesn't mean that his lawyer did anything wrong or failed to do a good job." We conclude that the post-conviction court did not err by finding that the Petitioner's guilty pleas were knowingly and voluntarily entered and that that the post-conviction court did not err in denying post-conviction relief.

B. Constitutionality of Criminal Gang Enhancement Statute

As his last issue, the Petitioner argues that the criminal gang enhancement statute is unconstitutional. See Tenn. Code Ann. § 40-35-121. He contends that the statute violates his due process rights because it did not require a nexus between the charged offense and the Petitioner's status as a gang member. The State argues that the Petitioner waived this issue because it was not included in his original or amended petitions for post-conviction relief and that he did not argue the issue in the post-conviction court.

In the Petitioner's pro se petition for post-conviction relief, he alleged that trial counsel "was ineffective for failing to challenge Criminal Gang Enhancement." At the post-conviction hearing, the only time gang enhancement was mentioned was when the Petitioner acknowledged on cross-examination that he agreed to the application of the

enhancement, but he claimed that trial counsel "never explained to me about no gang enhancement." The State told the Petitioner, "Okay. We'll talk about that," but the criminal gang enhancement was never mentioned again. At no point during the proceeding was the constitutionality of the criminal gang enhancement statute challenged.

Our supreme court has cautioned that "[i]ssues not addressed in the post-conviction court will generally not be addressed on appeal." Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005). Specifically, our supreme court has noted that a constitutional challenge should be raised first in the trial court to afford the opportunity "for the introduction of evidence which might be material and pertinent in considering the validity of the statute." Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983). Our supreme court has held, therefore, that "questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion." Id.

In a recently published opinion, State v. Bonds, 502 S.W.3d 118 (Tenn. Crim. App. 2016), this court examined the constitutionality of the criminal gang enhancement statute, Tennessee Code Annotated section 40-35-121(b), which provides that "[a] criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed." The statute defines a "criminal gang offense" as an offense committed or attempted prior to July 1, 2013, "[d]uring the perpetration of which the defendant knowingly causes, or threatens to cause, death or bodily injury to another person or persons . . . ." Tenn. Code Ann. § 40-35-121(a)(3)(A)(i). This court determined that the statute was not unconstitutionally vague. Bonds, 502 S.W.3d at 153-54. Nevertheless, this court, citing State v. O.C., 748 So.2d 945 (Fla. 1999), concluded that "the statute lacks a nexus between gang membership and criminal conduct" and that

> such an omission is constitutionally fatal. It simply cannot be maintained that a statute ostensibly intended to deter gang-related criminal conduct through enhanced sentencing is reasonably related to that purpose where the statute in question is completely devoid of language requiring that the underlying offense be somehow gang-related before the sentencing enhancement is applied. Without a nexus requirement, [s]ection 40-35-121(b) directly advances only the objective of harsher treatment of criminal offenders who also happen to be members of a criminal gang. Because [s]ection 40-35-121(b) fails to even obtusely target gang-

related criminal activity, it lacks a reasonable relationship to achieving the legitimate legislative purpose of deterring criminal gang activity and therefore violates the principles of substantive due process.

Bonds, 502 S.W.3d at 154-55.  Further, this court stated:

> We believe that [s]ection 40-35-121(b) runs afoul of the bounds of due process delineated in Scales[ v. United States, 367 U.S. 203 (1961),] because it imposes mandatory criminal punishment based on the criminal conduct of others. Without a nexus requirement that the underlying offense be gang-related, [s]ection 40-35-121(b) is untethered to any personal criminal intent or conduct by the defendant.  There is no Tennessee law prohibiting membership or affiliation with a criminal gang as defined in [s]ection 40-35-121.  Thus, a defendant's affiliation with such a group is statutorily permissible and innocuous until it is joined with otherwise criminal conduct.  However, [s]ection 40-35-121(b) imposes mandatory punishment on an eligible defendant by imputing to him responsibility for the criminal activity of the gang as a collective without requiring the defendant's knowledge of and intent to promote such activity.[6]  We simply cannot believe that the concept of personal guilt articulated in Scales tolerates such an attenuated basis for criminal punishment. Indeed, a literal reading of the statute reveals that the scope of its potential application is startling, also posing an increased risk of arbitrary application.

Id. at 158.  Since Bonds was issued, this court has reiterated its holding that Tennessee Code Annotated section 40-35-121(b) is unconstitutional.  State v. Gerald Lamont Byars,

---

[6] Effective April 28, 2016, Tennessee Code Annotated section 40-35-121 was revised to provide in pertinent part:

> (b) A criminal gang offense committed by a defendant shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed if:
> (1) The defendant was a criminal gang member at the time of the offense; and
> (2) The criminal gang offense was committed at the direction of, in association with, or for the benefit of the defendant's criminal gang or a member of the defendant's criminal gang.

No. W2016-00005-CCA-R3-CD, 2017 WL 758517, at \*14-17 (Tenn. Crim. App. at Jackson, Feb. 27, 2017); State v. William Jermaine Stripling, No.E2015-01554-CCA-R3-CD, 2016 WL 3462134, at \*7-8 (Tenn. Crim. App. at Knoxville, June 16, 2016). Because this court has held repeatedly that Tennessee Code Annotated section 40-35-121(b) is unconstitutional, we conclude that "the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion." Lawrence, 655 S.W.2d at 929. Therefore, we conclude that the Petitioner's challenge to the constitutionality of the criminal gang enhancement statute is not waived.

Next, we must determine whether our decision in Bonds is a new rule of law that should be given retroactive effect on collateral attack. In Bush v. State, 428 S.W.3d 1, 16 (Tenn. 2014), our supreme court held "that the retroactivity of new constitutional rules in post-conviction proceedings should henceforth be determined using [Tennessee Code Annotated section] 40-30-122," which provides:

> For purposes of this part, a new rule of constitutional criminal law is announced if the result is not dictated by precedent existing at the time the petitioner's conviction became final and application of the rule was susceptible to debate among reasonable minds. A new rule of constitutional criminal law shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty.

We conclude that Bonds announced a new rule. Generally, every act of the General Assembly is presumed constitutional. Bonds, 502 S.W.3d at 156 (citing Riggs v. Burson, 941 S.W.2d 44, 51 (Tenn. 1997)). We note that Bonds was the first case to address the constitutionality of the criminal gang enhancement statute. Accordingly, this court's declaring the criminal gang enhancement statute unconstitutional was not dictated by precedent at the time the Petitioner's conviction became final.

Nevertheless, "[a] new rule of constitutional criminal law shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe . . . ." Tenn. Code Ann. § 40-30-122. We conclude that Bonds falls into this category of new rule, namely because it prohibits the State from penalizing affiliation with a criminal gang without requiring a nexus between the affiliation and the criminal action. See Bush, 428 S.W.3d at 17. Therefore, we conclude that Bonds should be retroactively applied in order to afford the Petitioner relief.

Next, we turn to the question of what relief should be granted. In the instant case, the Petitioner pled guilty to three counts of aggravated assault, which were Class C felonies, and agreed that the criminal gang enhancement statute, which raised the offense to Class B felonies, applied to each of those convictions.

We must now determine the effect of the Petitioner's plea agreement. In our view, the criminal gang enhancement was not a material element of the guilty pleas. Cf. Smith v. Lewis, 202 S.W.3d 124, 130 (Tenn. 2006). The Petitioner testified that he entered guilty pleas to avoid the risk of a longer sentence. Trial counsel testified that the Petitioner was charged with eleven offenses, that he was facing a sentence that would result in his never being released, and that the State's case against him was strong. Moreover, we note that the sentences for the Petitioner's aggravated assault convictions, which were the only sentences enhanced by the criminal gang enhancement statute, were to be served concurrently with his thirty-year sentences for attempted first degree murder; therefore, the criminal gang enhancement did not affect the length of his total effective sentence. See Brian Roberson v. State, No. M2013-02319-CCA-R3-HC, 2015 WL 1955536, at *5 (Tenn. Crim. App. at Nashville, May 1, 2015). Accordingly, we conclude that we must reverse the judgments for the aggravated assault convictions in counts three, four, and five in case number 100379; vacate the criminal gang enhancements in those convictions; and remand for entry of judgments reflecting that each aggravated assault conviction is a Class C felony with a sentence of fifteen years. The Petitioner's total effective sentence remains the same. The judgments of conviction are affirmed in all other respects.

### III.  Conclusion

In sum, we conclude that the post-conviction court did not err in concluding that the Petitioner received effective assistance of counsel. Nevertheless, because Tennessee Code Annotated section 40-35-121(b) is unconstitutional, we must reverse the judgments for aggravated assault and vacate the criminal gang enhancements. The case is remanded to the post-conviction court for entry of judgments for aggravated assault reflecting that the convictions are Class C felonies. Moreover, the sentence for each conviction is reduced from thirty years, the maximum sentence for a career offender convicted of a Class B felony, to fifteen years, the maximum sentence for a career offender convicted of a Class C felony. The fifteen-year sentences for the aggravated assault convictions will be served concurrently with the thirty-year sentences for attempted first degree murder as provided in the plea agreement for a total effective sentence of thirty-six years.

_____
NORMA MCGEE OGLE, JUDGE